And indeed our last case today is Stanton Grotenhuis v. Mark and Karen Savoree, correct? Yes, sir. This is case number 4-100092. And for the appellant, we have Stephen Amjad and for the appellee, Larry Lefevre. You may proceed. May it please the Court, Counsel? My name is Steve Amjad. I'm here arguing on behalf of Mark and Karen Savoree. The Savorees, I just want to make it clear to the Court, aren't necessarily asking to be let out of the guarantees in this case completely. What they are asking for is for the bank to prove its case that the March 07 Ronin $1.5 million guarantee should be used to make good on the debt that is at issue here. They're asking that the collateral that was in place in March of 07 be used to offset the debt, which wasn't done in the trial court. It wasn't proven by the bank that that actually happened. So what did happen? I think the easiest thing to understand in this case is that first of all, we're asking for Audrey Savage's deposition. I'm not going to go into that in a great deal of detail. But in order to focus more specifically on the issues, I think it's easiest to look at what we're asking for as to each count. As to the counterclaim itself, we're asking for the immediate return of the $1 million CD. The reason for that is that it was collateral for a guarantee that wasn't even sued on in this case. Collateral for a debt that wasn't even at issue in this case. It was applied to notes that weren't in place when the guarantees were signed. It was applied to two notes, buyer's notes, for money lent after the initial guarantees were signed. It should not have been done that way. The Savary's should have gotten their $1 million CD back at the time of the restructuring. As to count 4, which is the Terre Haute 4 note, Mark Savary has asserted that he signed the Ronin guarantee because he thought that note was going to be released. All of his obligations under that note were going to be released. It was one of the conditions of his signature on the guarantee in March of 07. That didn't happen. He shouldn't be liable under that note. At the time he signed that note... Was that in writing? No, it was an oral condition. The only written proof of those conditions are two things that are in front of you. One of them is, and when I say it wasn't a written condition inside of the guarantee, it was conditions that both the parties understood, which under the law makes it a condition of the guarantee. We have, in the record, executive committee meetings from the bank on February 26, 2007, which outlined 12 conditions of the terms of the agreement. Let me stop you there. You say under the law. When you make that statement, are you saying that there are cases that say we don't look to the four corners of the contract, of the guarantee, and we go outside of that if there's no ambiguity? Yes, actually. There are cases that we have cited in our brief about the looking to the external conditions of the guarantee. If you give me one minute, Judge. There are cases, I believe it's in East Moline, where there can be oral conditions to a guarantee. I don't have the site specifically in front of me, but in East Moline, what happened there was there were 13 signatories, and basically, my recollection is that if both the parties agreed that there were 13 signatories, if both of the parties are aware of the conditions of the guarantee, they're included in the guarantee's language. In this case, both the parties were aware of the conditions of the guarantee. How do you know that? Well, you know that because we have the executive committee meeting minutes, which outline the conditions. We then have an email from Mr. Wolf to Mark Savory that repeat the conditions. And then we have Mark Savory's trial testimony in which he says, these are what I thought were the conditions when I signed the guarantee. Now, in addition to that, we also have the issue of collateral estoppel. What is it that induced Mark to sign these guarantees at the time they were signed? The promises of the bank induced Mark to sign these guarantees. The confirmation he received afterwards, in the months that followed, as he attempted to get these oral conditions into writing, he was told, and I would say lulled into sort of a passivity by the bank, specifically the September 2007 letter that Mr. Wolf wrote to him, in which Mr. Wolf outlines nearly all of the conditions that Mark thought were in place in March. Mr. Wolf goes so far as to assert that the actual loan agreement that he has drafted with the Bayers includes many of the conditions that Mark thought were in place. Mr. Wolf offered him assurances that he anticipated receiving that signed loan document back from the Bayers very soon. And all those things caused Mark to not take a whole lot more action. He just relied on what the bank told him. That's what happened in this case. So going back to Count Ford, the Terre Haute Ford note itself, at the time that Mark agreed to enter into this transaction, Terre Haute Ford, Sullivan Ford, and Paris Ford all had a great deal of assets, about two to three million dollars worth of cash and inventory. Mark thought that one of the conditions was that if the Bayers could not pay off this Terre Haute Ford note, that the inventory and cash Terre Haute Ford had would be used to pay off the note. That didn't happen. It was supposed to happen, but it didn't. As to Count Seven, the Ronin guarantee for one and a half million dollars, well, there was no testimony as to how the original notes from 2007 were tied into the 2008 notes. There was no testimony tracking that money, which is required under the law when you're trying to enforce a guarantee. None of that happened in the trial court. What did happen was the collateral was just generally used not to pay notes that had the Ronin name on it. The collateral was generally used to pay off Bayers notes, a Wabash note, entities that weren't even related to the original transaction. So, again, on the Ronin guarantee, there needs to be a showing and proof that Mark actually really owes money on the Ronin note that was for 1.895 million dollars from January of 2008. There hasn't been any proof of that. The Sullivan note is Count Eight. That on its face... proof of the application of collateral to the notes themselves, the standard review for that, I think, would be manifest weight of the evidence. I believe that that applies to the trial court's analysis of the facts as it pertains to the language. But your analysis as to the language of the notes in the guarantee should be de novo. So there is a definite split, in my opinion, as to the standard of review. As to the Sullivan note and the guarantee that's sued on under Count Eight, on its face, we believe that that note negates Karen's obligation under her guarantee because Mark was a subsequent guarantor. The guarantee that Karen has specifically defines indebtedness and accepts out any future refinances or future reworkings of debt in which there's a separate, different guarantor. So Karen should not be liable under that note at all. The trial court had that pointed out to it in the post-trial motion, but I think it did not correctly interpret that language and held Karen liable for the Sullivan note. The Sullivan note as to Mark itself, very similar issues to the Terre Haute Fort. Again, that note was supposed to be covered under his new guarantees, which Mr. Wolfe's letter specifically talks about. Mr. Savory gave an additional half a million dollar guarantee in order that he would be released from his obligation under the Sullivan and Terre Haute Fort note. Mr. Wolfe talks about, in September, he talks about how once the Sullivan and Terre Haute Fort obligations go away and are paid off, his guarantee will be reduced dollar for dollar for however much of those notes are paid off. So the proof after March shows that Mr. Savory had these conditions in place. Mr. Savory was induced, based upon the representations by the bank, as to what was going to happen to the Terre Haute Fort note, the Sullivan Fort note, and the Ronan debt to sign all of these guarantees. I've already spoken about why I think a hybrid of the standard of review should be in place. I do want to talk a little bit about the balances on the notes. I don't feel that the court utilized the evidence in front of it to reach a reliable decision, a decision that you should agree with as to the balances of the notes themselves. There was no proof on what was owed on the notes. From the questioning of Mr. Wolfe, he said he could look back at the transactions, but he could not testify as to the outstanding balance on the Ronan notes from March of 07. He said he believed that those notes became the January of 08 notes, but he couldn't say definitively whether the $1 million Ronan note or the $2.5 million Ronan note or the $1.5 million Ronan note became the Wabash note or the Breyer's notes. Mr. Wolfe also testified that an additional $1.2 million was added into the pot of these notes in fall of 07. That, to me, tells this court and should have told the trial court that these transactions were different, that Mr. Savory and Karen Savory didn't guarantee anything that happened in January of 08. In fact, just before the restructuring took place, Mr. Savory sent a letter saying, I don't want you to restructure. I don't want to guarantee anything. And a day later, they restructured everything. Less than two months later, they foreclosed and took all of the assets out of the guarantee. If we look at this case from the perspective of the direct language on its face, what's before you? If I may approach, I've pulled out charts A and B from our brief. For ease of reference. Thank you. I've tried in charts A and B to make the language of the documents as clear as I can. And if we look at this, really what we have is two parallel transactions. We have a transaction from March of 07 and a transaction from January of 08. What I've done is taken all the language from the notes and shown this court what the note says, what the guarantees say, and what the collateral says. You can see in March of 07 the state of the guarantees and collateral. Ronan Automotive had three different notes. Terre Haute Ford had a note and Sullivan Ford had a note. In the time period from March of 07 until January of 08, there's additional money added in. The Bayers borrow $1.2 million. That's unrefuted. Then on January 23, 2008, the Terre Haute Ford note is still in place, the Sullivan Ford note is still in place, and we have four new notes. One of which is the Ronan Automotive note for now $1.895 million. Then we have a Wabash Valley note, and we have two personal notes to the Bayers themselves. What didn't happen and had to happen in the trial court in order for the bank to be able to enforce their guarantees was a connection between Chart A and Chart B. In order for the bank to be able to enforce its guarantee, the bank had to prove that Mark Savory in fact guaranteed the 2008 transaction. It didn't do that. There's no direct relation of any of Ronan's transactions from March of 07 through January of 08. There's no relationship. The only way they go about doing this, and I think what happened if you take a step back, I don't know for sure, but the only approach that makes logical sense to me is that the bank realized it knew it was in trouble, sometime in late 07, and tried to figure out a way to cover its unsecured debt. What did it do? It refinanced everything in January of 08 and blurred all the lines between the guarantees because you can see none of the guarantees in the January of 08 transaction, none of the notes refer to specific guarantees with specific dates. None of them do. The law requires the guarantee language to be explicitly interpreted. If you do that, looking at the March transactions, there's no way you can do what the bank did in January of 08 without Mr. Savory and Karen Savory's permission. The only relationship, as you're looking at chart B, between any of the collateral or guarantees that is specific between these two transactions are the Terre Haute Ford and Sullivan notes, which we've already talked about, and the item under note number 8, collateral number 9, it says assignment of account dated January 23, 08, of the CD number 21,799. The CD number 21,799 is the million dollar CD that the Savory's are asking for. That's the counterclaim, the subject of the counterclaim. The problem is that the Savory's weren't a part of this transaction. There's no way, legally, that the bank could have assigned the Savory's CD, which they owned, without the Savory's permission in January of 08. It was collateralized by a guarantee. I'm sorry. It was collateral for a personal guarantee that Mark signed. Karen didn't sign it. Mark signed it. And that's fine. If that guarantee was still in place, they could have taken the CD. But they changed it. And then after they changed it, what did they do? They didn't apply this CD that collateralized a Ronin note to a Ronin note. They applied it to the Bayer's notes, notes that they didn't have any security for or collateral for. They took the entire million dollars and applied it only to the Bayer's notes. That's undisputed. Now, there's confusion in the trial court because trial counsel, Savory's trial counsel was referring to it as the Wabash note, but that's a mistake that it seemed continued after he made that incorrect reference initially. All the testimony about the application to the Wabash note was really the Bayer note when you look at the account number. So they applied the entire CD, $971,552 to pay off that entire note. Then they took the remaining $29,000 and applied it to the other Bayer's note. Absolutely undisputed that $1.2 million was added from a personal loan to the Bayer's into this transaction in the fall and then rolled into these notes in January of 2008. Undisputed. The trial court should not have allowed Mark Savory's guarantees to continue. I believe based on all that evidence. Did you fill the language in the guarantees and any extensions, renewals, or replacements thereof? Did the trial court find that this was an extension or replacement of the original guarantee? And why is that finding against the manifest way of the evidence? Well, I don't think that the trial court was correct in finding that this was a renewal because there was no evidence at all that supported where the Ronin original notes went into the notes that came about less than a year later. How about the $1.895 million Ronin note that came out later? Mr. Wolf could never definitively say which Ronin note that money came from. Wouldn't it be reasonable to infer that the guarantees at the original closing on the Ronin notes were extended to or rolled into the $1.895 million on the restructured Ronin note? Your Honor, it wouldn't be if the language on the guarantees themselves wasn't as specific as it is. The language on the guarantees themselves that they sued on is absolutely specific. It's tied to a specific Ronin note. If you look at the language of the guarantee, it says that it is tied to the note that was entered into between the bank and Ronin Automotive in the amount of $2.5 million. The other Ronin guarantee that was collateralized by the CD specifically says it's tied directly to the Ronin note in the amount of $1 million. So you have to look at the exact language. There's no ambiguity in that language. The problem, the disconnect occurs because the trial court did exactly what you said. It didn't require the bank to show this guarantee, which is only tied to this pot of money, went into this note over here. This guarantee, which is only tied to this pot of money, went into this note. All the trial court did was say, well, we got guarantees. Let's just apply them to everything. And that's incorrect. The law says you have to specifically apply the language, the unambiguous language of the guarantee. You have to construe it in a way that is in the favor of the guarantor. If you do all that in this case, the savories did not guarantee the Bayer's notes. It's an impossibility to reach that conclusion from the face of the guarantees. So the... Even if I agree with that, how about the Ronin note, the restructured Ronin note? Well, even if you agree with what I said, which I think you should, the restructured Ronin note, they still have the burden of showing how the $1 million note, the $2.5 million note, and the $2 million note went into the new transaction because of the fact that the guarantees are tied to specific notes. You can't expand the language. You've got to go with what the language says on its face. The CD itself also says... I'm sorry, the guarantee, the $1 million guarantee itself also says it only guarantees the $1 million note to Ronin Automotive dated 3-1-0-7. It doesn't say anything about the Bayer's, the Bayer's personal notes, nothing. I mean, at the least, I've talked a lot about that issue, but at the least, I believe you should follow everything we've asked for in our brief, but at the least, that $1 million CD should be returned. Thank you for your time. Thank you, Counsel. Thank you, Counsel. Mr. LaFever. May it please the Court, Counsel. This transaction started when Mr. Savory approached Mr. Grotenhuis and asked him to finance the purchases of three automobile dealerships that Savory owned or had an interest in the stock. It was a $5 million deal. According to the opening statement of Mr. Savory's attorney, when they first talked about this in February of 2007, Savory told Grotenhuis they needed to do it in a hasty fashion. And indeed, they did it in a hasty fashion. This $5 million deal closed March 1, 2007, less than 30 days later. When they show up to close the deal on March 1, less than 30 days later, the representative of the bank, Brad Wolf, asked Mr. Savory what was the status of the approval of Ford. According to Mr. Wolf, he testified, we asked for proof that it was approved by Ford and we were told by Mr. Savory that would be forthcoming in a few days, but time was of the essence and the deal needed to be closed. In the opening statement, again, of Mr. Savory's attorney, he acknowledged that Savory wanted the deal closed in a hurry. So they closed the deal on March 1. At the closing, another thing occurred. Mr. Savory shows up and says, well, the original deal was that we were going to pay off from this $5 million the Terre Haute Ford loan and I believe the Sullivan Ford loan. But when he got to closing, he said, no, we're not going to pay those off. Bayer or his entities will pay them off. So the entire proceeds of the $5 million loans will go to Savory. Savory appears at the closing, makes the change in the condition, assures the bank that the Ford dealership will be transferred in a few days, and he signs four documents. He signs Plaintiff's Exhibit Q, which is a guarantee. The guarantee was to Ronan Automotive, Inc., any amount of $500,000 dated 3-1-0-7, and any extensions, renewals, or replacements thereof. And then the guarantee was limited to $1 million, excuse me, $1.5 million. This was a guarantee that was the basis for the Count 7 judgment, which was limited to $1.5 million, even though the refinanced note of Ronan was $1.8 million or something like that. Mr. Savory also signed another guarantee. That's a Defendant's Exhibit 7, and this guarantee was again to Ronan Automotive, Inc., any amount of $1 million, dated 3-1-0-7, and any extensions, renewals, or replacements thereof, here and after referred to as indebtedness. This was also limited to $1 million, but it was secured by a certificate of deposit. Then he also signed a security agreement and a certificate of deposit. And that's Defendant's Exhibit 2. And that security agreement states the following described debts, plus all extensions, renewals, modifications, and substitutions to Ronan Automotive, Inc., in the amount of $1 million, dated 3-1-0-7. And then finally he signed the stock purchase agreement, which is Defendant's Exhibit 6, which forms the basis of the $5 million transaction that he was to receive for the sale of these three entities. The problem was that Ford never approved Bayer as a franchisee. The franchise did not get changed in spite of the recommendation or the assertion by Mr. Savary. Where did the $5 million go? Presumably to Mr. Savary. That's what the Defendant's Exhibit 6 would say. So he was receiving this money to sell the dealerships. In addition to that, he was receiving the agreement of Bayer to pay off these other two loans that he already had in place, that Mr. Savary already had in place. In January of 2008, it became apparent that they had to do something to try to help Bayer out to get the Ford franchise. So the bank did that, and they restructured the loans. And when they restructured the loans, they did a replacement note to Ronin Automotive in the amount of $1,895,000. That is what formed the basis of the judgment on Count 7, since the guarantee of the Ronin Automotive loan was limited to $1.5 million. That's what the judgment is for, $1.5 million. So that's how we get from the original loan transaction to the restructure, the substituted note, and the guarantee guaranteeing that note because it was a replacement note. One of the things I found interesting about what appeared to me in the brief, the fog of confusion of trying to say that we've got to pin these guarantees to the original notes. And then they attached the original notes in the appendix, and they show on Exhibit C, I believe. And when I went through the common law record, the record on Peel, it has a packet of exhibits. I looked for those notes. They're not there. The reason they're not there is because they were never admitted into evidence. Those notes, and they're the first three notes referred to on the chart that Council handed to you, were attached to the motion to reconsider. They weren't admitted into evidence at trial. So any reliance on those exhibits, there was no request to open the proofs. There was no request to admit them into evidence. They weren't part of the trial. So I'm not sure it makes a whole lot of difference except that it kind of confuses the issue. The fact is that the trial went forward based on the fact that these were replacement notes and that the guarantees guaranteed the original indebtedness plus any replacements of that. As to the next part of the judgment in favor of the plaintiff, there was a judgment against Mark Savory for $689,068 in principal. This was on a Tara Holt Ford note. That note was admitted into evidence and that note contains the signature of Mr. Savory as a representative of the corporate entity and his signature personally. Now you'll recollect originally they were going to pay that note off as part of the transaction, the original transaction of March of 07. That wasn't done, so he remained liable on that note as principal and the court found him liable on that note as principal. The original deal was to pay those two notes off, the one to Tara Holt Ford and the one to Sullivan. But at closing, according to the uncontradicted testimony, Savory showed up and said, no, we're not going to pay those off, the buyer is going to pay them as part of the transaction. Well, it makes sense from the point of view that now Mr. Savory is able to take home another million dollars. Now I don't know why that was done, I agree with you, but the fact is, the unroboted testimony, uncontradicted testimony, is that this was done at his request. Now everybody hoped the deal would go through. Obviously there's some wishful thinking, it's a quick deal, it's being done as an accommodation to Mr. Savory so he can put this deal through so he can get Bayer to buy these dealerships, but it didn't. So this is the consequences of what happens when it doesn't go through. You say it makes sense because he was going to get another million dollars, I thought the loans were too ronin. The loans were too ronin to pay off the stock purchase agreement, which shows Savory selling his entities to Ronin for five million dollars. The note that I was referring to, they signed it individually and personally as plaintiff's exhibit F. Then there was another loan, that would be the Sullivan loan, where a judgment was entered for $93,000 in principle. This one is another one of those loans that wasn't paid off at the time of closing. This one had two guarantees. It had the guarantee of Karen Savory as well as the guarantee of Mark Savory. The court found those guarantees were good and entered judgment accordingly. The judgments were based on the confession of judgment. That judgment was admitted into evidence without objection, which showed the amounts that were due from the underlying debtors, the guaranteed debts. And on the testimony of Brad Wolf, the banker, who said that all of the allegations in his complaint were true and correct. That was done without objection. Then there was another exhibit admitted into evidence to show the balances due, although that was not stipulated to be accurate. So there was evidence in the record for the court to determine what the amount of the judgment should be. I mentioned the January 2008 restructure. There was the new Ronin note. That's plaintiff's exhibit B and that note was $1,895,000. The judgment based on that note was $1,500,000 because of the limitation in the guarantee. There were two other replacement notes that come into play. These are notes that were executed by Bayer. The testimony was that they restructured this with the hope of getting Ford to agree to the debt structure of the entity so that they could transfer the franchise. That didn't happen, but in an attempt to do that, there was a new loan, a replacement loan, as part of the restructure to the Bayers in the amount of $971,500. That's plaintiff's exhibit F. This goes to the counterclaim. This goes to where the application of the proceeds of the certificate deposit went. They went to this loan, the principal amount of this loan. There was no interest added to it, no cost. That amount was applied in a full amount of $971,500. There was a second replacement note to Bayer of $1.2 million. Of that, approximately $30,000 of the certificate deposit was applied to that note. Let me see if I understand this. The CD is pledged to secure Ronan's note, correct? Or any renewals or replacements of that note. That is correct. Subsequently, the CD is used to satisfy Bayer's notes and Walbash's notes, correct? Primarily Bayer's notes. And in a small part, Walbash's notes. Why should this court countenance the pledge of the CD to pay Ronan's notes to satisfy a new promissory note being Bayer's and Walbash's? In Bayer's notes, the testimony was clear that those were substitutions of the original Ronan's notes. You can pledge a CD to secure X's note and the bank can substitute the original obligor with a new obligor and the CD I pledge can still be used to pay the new debtor's obligation? The new debtor's obligation replaced the original debtor's obligation. I understand that you're arguing that, but I'm having a hard time wrapping my brain around an individual using a CD to pledge one person's obligation and then finding out that that CD was used to satisfy another person's obligation. Just because a bank said, well, we're going to count the new obligation as an extension of the original obligation, even though there are two different obligors. I think the bank's position is it was a replacement of the original obligation. Also, the contradicted testimony was that the original notes were never paid. So I think for both of those reasons, Judge Gress's decision on that should be affirmed. I also think the language of the assignment of the CD that it was all extensions, renewals, modifications, and substitutions. I think that also contemplates that the indebtedness is what's involved and that if the indebtedness is a substitution or a replacement of the original indebtedness, that that's what the guarantor is agreeing to satisfy. What if your debtor in the first instance was an insolvent debtor and they could have collected the note against the insolvent debtor? Without Savaree's permission, why is that okay? That's not what happened here, first of all. There may be a different defense to that. But secondly, I think because the loan guarantees themselves say that they can increase the debt, they can deal with the collateral however they want to. So I think that the guarantees themselves allow that to have happened. So if for some reason Bayer was less solvent than Ronan was when they did the replacement note, I think the guarantees allow them to do that. The final point I'll make is that in the record there's also the Ford letter, that's Plaintiff's Exhibit AA, which basically says this is over. We're not going to give the new entities the right to use the franchise. This letter is directed to Mark Savaree, so he's still got these franchises all this time. It's never been transferred. It basically refers to the transaction of March 2007 as an unauthorized stock transfer and he asked Mr. Savaree to unwind the deal, which of course that was never done and that was the final blow to the original transaction and everybody went into default, hence the judgments rendered against Mr. Savaree. Thank you. But Mr. Savaree got the $5 million to sell as purchase price for the dealerships? That is, I've got to hang my hat on the exhibit that I identified, I think it was Dependents II, because that's what it says. I don't know if there's any specific testimony of that at trial, but I'm sorry, it's Dependents Exhibit VI. It was entered into evidence. It shows that the purchase is $5 million and it also talks about any other liens or anything on the property in Exhibit D and there's nothing listed, so presumably that's what happened. I can't say that for sure. Thank you, Counsel. Rebuttal, please. I'll answer your question, I'm okay with that. I don't think the record indicates whether or not he gave up $5 million, but the record does indicate that he gave up control of $2.5 million in cash and inventory. He gave it up on March 1, 2007. He also collateralized... Couldn't he get it back? No, because he had sold it in the stock purchase agreement. He sold all the assets, all the cash in Terre Haute Fort, Paris, Sullivan, got all rolled into Roman. But he got $5 million. He got $5 million and gave control of $2.5 million in cash and inventory. Didn't he in effect sell $2.5 million worth of goods for $5 million? Well, the dealership itself, the franchise with Ford is worth something too. And then he also gave deals on leases and mortgages. The answer to your question is yes. I'm not trying to avoid it. This comment is directed to both of you. We've got some time here, so there's a lot of unanswered questions in our minds. You folks seem to know your case fairly well, but this is a blur to us. We can't figure out whether it's a shell game or it's two operators of a shell game are trying to out-shell the other or what it is. But there's all this money flying around and we don't know who got it. Well, I can try to clear that up for you, Judge. I don't think there's any evidence in the records. I'm a little hesitant to say he got $5 million. It's the only reason I'm backing off that. What I can tell you happened was $2.5 million in cash and inventory from Sullivan and Terre Haute and Paris were used to collateralize all of the Ronin money. $5 million. All of the $5 million. In addition, Mark also pledged a $1 million CD and gave $2.5 million in personal guarantees. So it's kind of a zero-sum game. We've got the collateral, the loan guarantees. So it's over that $6 million. No, it's $5 million. Let me do the math. Five to five. Five and five. The guarantees and all the collateral and cash equal five and Mark took five. And if counsel disagrees with me, it's fine if the court's okay with him speaking up. But I think that's what happened. Okay. So $2.5 million in guarantees. Because there's two different guarantees. A $1.5 million guarantee and a $1 million guarantee. Add them together, we're at $5 million. I want to go to that though. You know, the bank keeps lumping all this money together from these transactions. And what it didn't address in its brief and what it didn't address now is the additional $1.2 million that was added in the fall of 2007 and lumped together. Now, walk this through mathematically. The original notes from March of 2007 were $5 million, the total of those notes. The total of the January 2008 notes was $5 million, $961,500.52. So there was $961,000 more in debt in January of 2008 than there was in March of 2007. Okay. The testimony, the undisputed testimony was that the March balance, I'm sorry, that the March notes were current as of the end of the year in 2008. Logically, the $5 million balance should have gone down between March and January because payments are being made each month. That didn't happen. The balance went up by $900,000, almost $1 million. Why? The trial court has no idea, we have no idea. The bank lent more money, lumped everything together, took the buyers. Lent more money to who? To the buyers. Okay. Lumped everything together and blamed it on Mark because Mark had the guarantees and had the financial wherewithal because he got the $5 million. Buyers didn't have two pennies to rub together. Bank blurs all the lines in January. Six days after the transaction, that Ford letter that he just read to you arrived at the Ford dealership. Six days after the refinance. Six days. Ford most likely had already made its decision. The bank wasn't helping anybody but itself. Six days later, they get the Ford rejection. On the 10th of March, less than 45 days later after the refinance, they foreclosed and gotten $4 million in change in judgments against Mark Savory. Less than 45 days later. That to me says bad faith. That to me says the bank wasn't helping the buyers, they were helping themselves. If you have any questions, I'm happy to answer them. When the bank foreclosed, how much money did they get from, I mean, are the dealerships still viable or are they still open or are they shut down? They're shut down. Okay. So they got the inventory and all that kind of stuff that was there on premises? Your Honor, you're asking me questions that I don't believe are in the record. All right. But if you'd like me to answer them, I can. Well, you know, I presume you fellows would prefer not to have it remanded, so. Actually, I think the Savory's would be okay with that, Judge. Well, that's okay. We'll struggle along until we've got that. Any other questions? Seeing none, thank you, both of you. The case is submitted and court stands in recess.